UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JOHNNIE FLOURNOY,
        Plaintiff,

v.                                                 02-1231

JAMES M. SCHOMIG, et. al.,
        Defendants.

MEMORANDUM OPINION AND ORDER

      This case was returned to the district court by the Seventh Circuit to proceed on the plaintiff's claims o f deliberate indifference to his serious medical needs by exposing him to the chemical agents in mace and on his claim of discrimination based on race by denying him a phone call and visits with his family. The court, through the Federal Civil Rights Clinic of The University of Illinois, College of Law, secured the services of two senior law students as *pro bono* counsel for the plaintiff. Now before the court are the two remaining defendants, JAMES M. SCHOMIG and JUDITH GRAGERT's second summary judgement motion [228], plaintiff's response [232] and defendants' reply [234].

Standard

      Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

      "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## Background

The plaintiff, a state prisoner, filed a complaint pursuant to 42 U.S.C. §1983, alleging that the defendants violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. The plaintiff claims that his Eighth Amendment rights were violated because the defendants were deliberately indifferent to a serious risk of medical harm to the plaintiff as a result of exposing him to the chemical agents in mace used for disciplinary reasons on other inmates in his proximity. The plaintiff also claims that the defendants discriminated against him because of his race by denying him a phone call to his seriously ill father and visits with his family. The court has jurisdiction pursuant to 28 U.S.C. §1331 and 1343.

## Undisputed Material Facts

1. The defendant Schomig was Warden of Pontiac from July 1999 to May 2002. (Schomig Aff., par. 3.)
2. The defendant Schomig was Pontiac Correctional Facility's Chief Administrative Officer. (Schomig Aff., par. 9.)
3. Pontiac is a statewide segregation facility in which inmates are confined to their cells for a majority of the day and movement within the institution is controlled. (Schomig Aff., par. 6.)
4. The cell houses at Pontiac functioned as self-contained prisons within a prison, and the determination of whether force was necessary was made by the ranking officers in the cell house. (Schomig Aff., par. 7.)
5. During Schomig's tenure as Warden, Pontiac housed approximately 1600 inmates and employed approximately 800 staff. (Schomig Aff., par. 4.)
6. Chemical agents may be used on an inmate to enforce compliance with institutional rules and lawful orders of staff. (Schomig Aff., par. 8.)
7. Chemical agents cause an inmate to become more compliant, which lessens the chance of harm to both the inmate and staff. (Schomig Aff., par. 8.)
8. Chemical agents are used in emergency situations when an inmate is attempting to harm himself or another person. (Schomig Aff., par. 8.)
9. Chemical agents can only be used by officers with the rank of Lieutenant or above unless the chemical agent was used during extraction by the Tactical Team. (Schomig Aff., par. 10.)
10. According to Departmental Rules and Regulations, prior to a chemical agent being used,

approval is required by the Chief Administrative Officer. (Schomig Aff., par. 9.)
11. Mace and other chemical weapons are expressly designed to affect mucous membranes of the sinus and eyes. Material Safety Data Sheet for Oleoresin Capsicum.
12. After the use of a chemical agent, the inmate upon which the agent was used was assisted with rinsing his eyes and body and was evaluated by a member of the health care staff if requested. (Schomig Aff., par. 11.)
13. The defendant Schomig claims he did not know about the plaintiff until the plaintiff filed this lawsuit. Schomig. (Schomig Aff., par. 16.)
14. Prior to a chemical agent being used, approval was required by Schomig, however, that approval could be, and was, delegated by Schomig to the Duty Warden, who was the rank of Assistant Warden or Major. (Schomig Aff., par. 9.)
15. The defendant Schomig signs hundreds of documents a week. Schomig Dep., p. 32, I. 3-4.
16. The defendant Schomig conducted rounds at the prison everyday. Schomig Dep., p. 40, I. 6-14.
17. Approval for the use of chemical agents was delegated by the defendant Schomig to the Duty Warden, who was of the rank of Assistant Warden or Major. (Schomig Aff., par. 17.)
18. Schomig did not approve any of the uses of chemical agent in the plaintiff's cell house at Pontiac. Schomig Affidavit and attached Use of Chemical Agent Log.
19. The plaintiff did not seek medical care when he was affected by the chemical agents in his vicinity. Plaintiff's Dep., p. 10, 1. 2-8; p. 16, 1. 24 - p. 17, 1. 9.
20. If an inmate had a medical problem that would be aggravated by exposure to chemical agents, a determination would have to be made by a physician and security staff notified. (Schomig Aff., par. 14.)
21. The defendant Gragert told the plaintiff to contact the nurse if he got sick after mace was sprayed. Plaintiff's Dep., p. 9, I. 17 - p.10, I. 1.
22. The plaintiff did not have any problems with his eyes noted on the Transfer Reception Screening form upon his arrival at Pontiac. (Grobe Aff., par. ____)
23. The plaintiff's medical records indicated that he had undergone surgery for his sinus and that he was identified as susceptible to glaucoma. Flournoy's Medical Files attached to Grobe Affidavit.
24. Glaucoma is a serious eye condition which often leads to blindness. Noted in *Hyman v. Rickman*, 446 U.S. 989, 991 (1980).
25. Mace and other chemical weapons may precipitate or exacerbate conditions of glaucoma. Riot Control Agents By Eugene J. Olajos, Woodhall Stopford p. 245.
26. Officials at Pontiac repeatedly used mace near the plaintiff's cell. Use of Chemical Agents 7/1/99 to 12/31/01 and Use of Chemical Agents 1/1/02 through 12/31/03.
27. The plaintiff alleges he was told by an officer regarding the use of chemical agents that, "we're getting back even with these gangs." Plaintiff's Dep., p. 16, I. 1 - 17.
28. When the tactical unit of the prison would spray mace, gallery officers would ignore inmates' requests to open windows. Flournoy Affidavit Dated November 7, 2002.
29. When mace was sprayed, officers would retreat behind a closed door, sealed from the gallery, and laugh and mock the inmates as they cried out in pain. Flournoy Affidavit

3

2002, Flournoy Dep., p. 9, 1. 12-19.
30. The plaintiff did not file a grievance regarding the use of chemical agents until January of 2002. Plaintiff's Dep., p. 15,1. 23 - P. 16, 1. 1.
31. The plaintiff told the defendant Schomig about the effects the mace was having on him when he was doing his rounds. Flournoy Affidavit Dated November 7, 2002.
32. The plaintiff says he was sprayed several times after he filed his grievances but did not complain about it. Plaintiff's Dep.m p. 15, 1. 23 - p. 16, 1. 1.
Adella Jordan-Luster signed her own name to documents. Letter from Adella Jordan-Luster Dated June 12, 2002.
33. The plaintiff was never told by a physician that his sinuses were affected any differently by chemical agents than another person's. Plaintiff's Dep., p. 27, 1. 2 - 15.
34. The plaintiff currently suffers from glaucoma, and it substantially interferes with his vision. Operative Report Dates September 12, 2007.
35. The defendant Gragert answered the plaintiff's first grievance about the chemical agents. Plaintiff's Dep., p.13, I. 10-12.
36. The plaintiff does not know if the defendant Gragert received his second grievance. Plaintiff's Dep., p. 13, I. 7-9.
37. The plaintiff never saw Schomig spray any chemical agent around him. Plaintiff's Dep., p. 23, I. 18-20.
38. The plaintiff's only medication is for glaucoma. Plaintiff's Dep., p. 5, I. 5-7.
39.

PHONE CALLS AND FAMILY VISITS

39. The plaintiff's father had been in a Veteran's Affairs cancer program since 1999. Plaintiff's Dep., p. 29, I. 1-6.
40. The plaintiff was allowed to call his family once a month while at Pontiac in investigative status. Plaintiff's Dep., p. 30, I. 11-14.
41. The plaintiff was allowed a special phone call to his family after notification that his father had passed away. Plaintiff's Dep., p. 34, I. 5-11.
42. The plaintiff believes the decision to deny him a funeral furlough was racially motivated. Plaintiff's Dep., p. 37, I. 8 - p. 38, I. 6.
43. The plaintiff knows of another, black inmate who was allowed to go on a funeral furlough. Plaintiff's Dep., pp. 36 and 37.
44. Tonya Davis, an Office Assistant in Clinical Services at Pontiac would sometimes assist the counselors in verying the information given by the family members. (Davis Aff., par. 1, 2.)
45. In order to verify a critical illness, Davis would call the facility where the family member was hospitalized and would speak with staff who could verify that the information received by the inmate or his family member was true. (Davis Aff., par. 4.)
46. After verification, Ms. Davis would forward the information to the counselor who would get signatures approving or disapproving the requested phone call. (Davis Aff., par. 7.)
47. The plaintiff never spoke directly with Warden Schomig about wanting to call his father or attend his funeral. Plaintiff's Dep., p. 38, I. 18 - p. 39, I. 11.

4

48. The plaintiff was notified by the Chaplain his father had passed away the day after the notification was received by Tonya Davis. Gragert Affidavit and Exhibit A.
49. The plaintiff's family was allowed to visit him after his father's death. Plaintiff's Dep., p. 44, I. 5 - 18.
50. The plaintiff does not know what the people at the hospital where his father was a patient told prison staff about his father's condition. Plaintiff's Dep., p. 46, I. 17-20.

The plaintiff claims the following are disputed facts. The court disagrees for the reasons set out in the footnotes following each of the plaintiff's assertions:

1. Any other inmate who is nearby and affected may also request to be seen by health care staff, and may use the water in their cell to rinse any affected body part. (Schomig Aff., par. 11.)[1]
2. It would be impossible from a security and staffing standpoint to always remove all of the inmates in the vicinity of chemical agent deployment. (Schomig Aff., par. 12.)[2]
3. The defendant Schomig is not aware of a significant number of inmates who complained of suffering ill effects from being in the vicinity of chemical agents while he was Warden. (Schomig Aff., par. 12.)[3]
4. The plaintiff did not seek medical care for eye complaints, either routine or as a result of being exposed to chemical agents. Grobe Affidavit[4]
5. There was no order by a physician in the plaintiff's medical records that he was not to be exposed to chemical agents. Grobe Affidavit[5]
6. There was no notation of chronic eye problems noted on Plaintiff's transfer form from

---

[1] The plaintiff's response that health care was available on a very limited basis was supported by the affidavit of another inmate. The court agrees with the defendants that the limited availability of health care does not negate the fact that Pontiac had a health care unit and medical staff available, and that inmates had water available in their cells to rinse affected body parts.

[2] The court agrees with the defendants that the warden of an institution would have personal knowledge of the security issues within his institution and what can and cannot be done at the time of a specific security threat, and his sworn affidavit cannot be defeated by unsupported conclusions.

[3] The plaintiff tried to dispute this fact by submitting affidavits of inmates, including the plaintiff, who could have no personal knowledge of what was known or unknown to the defendant Schomig and would not defeat his sworn affidavit.

[4] The plaintiff's response that he sought care at Stateville does not negate the fact that the plaintiff never sought care for his complaints after his alleged exposure to chemical agent while at Pontiac.

[5] The plaintiff asserts that he did not have access to the documents proving this statement; however no motion to compel discovery was filed regarding this issue.

5

    Pontiac to Menard Correctional Center Center in June, 2002. Grobe Affidavit. [6]
7.  Schomig did not have access to inmates' medical records and did not have the training or license to determine the medical needs of inmates. (Schomig Aff., par. 14.)[7]
8.  Medical personnel were always available to inmates at Pontiac, and nurses made regular rounds of the cell houses. (Schomig Aff., par. 14.)[8]
9.  Schomig never knew about or condoned the use of chemical agents or force of any type simply because an inmate had a particular gang affiliation or any gang affiliation at all. (Schomig Aff., par. 15)[9]
10.  The use of force was determined on a case by case basis and was driven by the actions of an individual inmate or, at times, group of inmates who refused to comply with lawful orders and placed the safety of themselves and others at risk. (Schomig Aff., par. 15.)[10]
11.  The plaintiff believes he was exposed to chemical agents on October 25, 2001, on April 10, 2001 and one or two times after that but did not complain to anyone because he did not want to make waves. Plaintiff's Dep., p. 5, I. 18 - p. 8, I. 10.[11]
12.  The plaintiff believes the use of chemical agents in December of 2001 or January 2002 was justified because the plaintiff did not like what the maced inmate said to the nurse. Plaintiff's Dep., p. 7, I. 24 - p. 8, I. 14.[12]

---

[6] The plaintiff attempts to dispute this fact by asserting that because the defendant Schomig has access to the medical records now, he must have had access to them during the relevant time period. The plaintiff cannot establish that the defendant Schomig had access to plaintiff's medical files while Schomig was Warden of Pontiac.

[7] The plaintiff attempts to dispute this fact by asserting that because the defendant Schomig has access to the medical records now, he must have had access at the time at issue. This statement is not sufficient to bring the defendant Schomig's assertion into dispute. The plaintiff cannot establish that the defendant Schomig had access to medical files of current inmates while he was warden of Pontiac. All the plaintiff's response establishes is that the defendant Schomig's counsel obtained the plaintiff's medical records after the plaintiff filed suit. The plaintiff cannot, and does not dispute that the defendant Schomig is not trained or licensed to determine the medical needs of inmates.

[8] The plaintiff attempts to dispute this fact by using the affidavit of another inmate that has nothing to do with personal involvement by Schomig or Gragert..

[9] In response to this fact, the plaintiff uses his own conclusory affidavit. The plaintiff has no evidence that the defendant Schomig had knowledge of the chemical agent used in the plaintiff's vicinity. The plaintiff also cannot, by his conclusory affidavit dispute the defendant Schomig's sworn affidavit about facts within the defendant Schomig's personal knowledge but not within the plaintiff's.

[10] Plaintiff's affidavit concludes without foundation that the defendant Schomig authorized the use of mace and closed windows to punish the prison population. The plaintiff cannot dispute the defendant Schomig's understanding of how necessity for the use of force was determined at Pontiac. Moreover, the plaintiff has no evidence that the defendant Schomig personally authorized any of the force in the plaintiff's cell house or that the use was inappropriate.

[11] In his response, the plaintiff contradicts his own sworn deposition. Nonetheless, he cannot show that any of the chemical agent used in his vicinity was ordered by the defendant Schomig or by the defendant Gragert or that he had any known medical reason why he should not be exposed.

[12] The plaintiff does not dispute this fact. He merely claims that he should have been removed from the vicinity.

6

13. The plaintiff did not file a grievance regarding the use of chemical agents until January 2002. Plaintiff's Dep., p. 8, I. 16-17.
14. The plaintiff says he was sprayed several times after he filed his grievances but did not complain about it. Plaintiff's Dep., p. 15, I. 23 - p. 16, I. 1.
15. The plaintiff was in investigative status in segregation during the times alleged in the complaint. Plaintiff's Dep., pp. 16 - 20.[13]
16. The plaintiff was never told by a physician that his sinuses were affected by chemical agents differently than another person's. Plaintiff's Dep., p. 27, I. 2 -15.
17. The defendant Gragert does not have any authority to make security decisions about the use of chemical agents, including what to do with the offenders in the vicinity of the agent. Gragert Affidavit.[14]
18. The plaintiff was not allowed to go on a funeral furlough because of his security and escape status. (Schomig Aff., par. 19.)[15]
19. Schomig delegated the determination of whether inmates received phone calls or visits to subordinates. (Schomig Aff., par. 18.)[16]
20. Schomig was not consulted about Plaintiff's request for a special phone call or family visit while Plaintiff's father was ill. (Schomig Aff., par. 19.)[17]
21. Counselors were directly involved in deciding inmates' requests for special phone calls and visits. Andre Jones Affidavit Dated July 17, 2006; Clarence Hayes Affidavit Dated July 12, 2006; Jason Cook Affidavit Dated Spetmeber 24, 2006.[18]
22. Neither the defendant Schomig nor the defendant Gragert were involved in denying the Plaintiff a special phone call or visit to his father. (Schomig Aff., par. 19; Gragert Aff., par. 6; Defendant's Exhibit A attached to Gragert Aff.)[19]

---

[13] The plaintiff uses his affidavit to contradict his deposition.

[14] The plaintiff does not dispute this statement, rather he offers his opinion as to what should have done instead.

[15] To dispute this fact the plaintiff proffers the affidavit of another inmate who would have no personal knowledge of why the plaintiff was denied a funeral furlough.

[16] The plaintiff seeks to dispute this fact by making a conclusive statement about which he would have no first hand knowledge. He proffers documents that are immaterial to the issues (funeral furlough form) and that were clearly signed by the Warden's designeee, as evidenced by initials after Schomig's name. on the Memo of April 19, 2002 (Response p. 17 of 42)

[17] The plaintiff seeks to counter the defendant Schomig's sworn affidavit by asserting he signed off on another type of form (funeral furlough) with much greater security implications than a phone call or visit. The plaintiff's offering cannot impute knowledge to the defendant Schomig in this way.

[18] This statement, based on the affidavit of inmates, is unsupported by persons with direct knowledge and cannot successfully contradict the sworn statement of the defendant Gragert that she only facilitated paperwork on phone calls and had no involvement in the decision to grant or deny special phone calls.

[19] To dispute this fact, the plaintiff uses a form clearly signed by a designee (Letter from Schomig dated April 19, 2002).

23. The defendant Gragert does not have the authority to determine whether an inmate may receive a phone call outside his regular allotment of calls. (Gragert Aff., par. 7.)[20]
24. Even though privacy issues disallowed receiving specific details about a person's illness, the hospital personnel could verify that the family member was, indeed, hospitalized and was in critical condition. (Davis Aff., par. 4.) [21]
25. Tonya Davis received a phone call from Plaintiff's sister, Gloria, sometime prior to April 17, 2002, requesting a critical illness phone call to Plaintiff's father. (Davis Aff., par. 5.)[22]
26. Ms. Davis wrote the information on a "Critical Illness or Funeral Furlough Form" and called the hospital to verify Plaintiff's father's status. (Davis Aff., par. 5.) and attachments.
27. Ms. Davis spoke with Beverly Hoskins, R.N. at the Evergreen Rehabilitation Center, and was informed that Mr. Flournoy was not critical, and that he was in the rehabilitation center for radiation treatment and a stroke. (Davis Aff., par. 6.) and attachments.
28. Because Mr. Flournoy's illness was not verified, no further action was taken. (Davis Aff., par. 9.)
29. The defendant Gragert's name would have appeared on the document had she received the information and/or acted on the information regarding Plaintiff's family's request for a phone call. (Gragert Aff., par. 6.) [23]
30. The defendant Schomig reviewed no grievance from Plaintiff about requests for special visits, phone calls, or exposure to chemical agents. (Schomig Aff., par. 20.)[24]

31. Counselors were directly involved in deciding inmates' requests for special phone calls and visits. Andre Jones Affidavit Dated July 17, 2006; Clarence Hayes Affidavit Dated

---

[20] The defendant does not dispute this fact, rather makes an argument about what other steps he believes the defendant Gragert should have taken.

[21] In response to this statement, the plaintiff makes an unsupported conclusion that contradicts Tonya Davis' sworn affidavit that the hospital did, indeed, give information about the status of the plaintiff's father.

[22] The plaintiff attempts to dispute Facts 25, 26, 27, and 28 by making unsupported conclusions about which he could have no firsthand knowledge to rebut the sworn affidavit of Tonya Davis who took the call, wrote the information, spoke with the hospital, and determined no follow-up was needed. The plaintiff's unsupported conclusions are not sufficient to create a genuine issue of material fact.

[23] The plaintiff attempts to dispute this fact by misstating Undisputed Fact 46 and ignoring Disputed Fact 28. Undisputed Fact 46, based on Ms. Davis' sworn affidavit, states that "after verification" the information would be forwarded. Disputed Fact 28 states that "because Mr. Flournoy's illness was not verified, no further action was taken."

[24] The plaintiff has no firsthand knowledge to rebut the defendant Schomig's sworn affidavit htat he did not receive or sign any of the documents. The plaintiff cannot state with firsthand knowledge that these grievances ever made it to the defendant Schomig's desk.

July 12, 2006; Jason Cook Affidavit Dated September 24, 2006. [25]
32. Policies and Procedures in place at Pontiac Correctional denied privileges to black inmates who were suspected of gang membership. Andre Jones Affidavit Dated July 17, 2006; Clarence Hayes Affidavit Dated July 12, 2006; Larry Beason Affidavit Dated September 26, 2006. [26]

Discussion and Conclusion of Law

It is a given that the defendants acted under color of State law at the times of the occurrences in question in this case. To implicate the defendants in a Section 1983 case the plaintiff must show that the defendants had some *personal involvement* in the deprivation of the plaintiff's constitutional right. *McDonald v. Illinois,* 557 F. 2d 596, 602 (7th Cir. 1977) (emphasis added). "However, a defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of Section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *Crowder v. Lash*, 687 996, 105 (1982). *See Kentucky v. Graham,* 473 U.S. 159 (1985). Essentially, a plaintiff can sustain a claim for relief under Section 1983 against a defendant that has a realistic opportunity to step in and prevent the violation of the plaintiff's right, but fails to do so. *Miller*, 220 F.3d at 495. "[A] supervisor satisfies [the] personal responsibility requirement for liability under Section 1983 if the conduct causing the constitutional deprivation occurs at supervisor's direction or with supervisor's knowledge and consent; that is, supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Hildebrandt v. Illinois Dep't of Natural Res.,* 347 F.3d 1014, 1039 (7th Cir. 2003).

In this case, the plaintiff, as a matter of law, cannot establish that either of the defendants had the requisite personal involvement for liability under §1983. Neither the defendant Schomig nor the defendant Gragert had any personal involvement in the plaintiff's alleged exposure to chemical agents or the failure of the plaintiff to receive medical care. The plaintiff argues that the defendant Schomig either ordered or knew that chemical agents were being used in the cell house as punitive measures against gang members, and that he was forced to be exposed to those chemical agents even though he had pre-existing medical conditions that would be aggravated by that exposure. However, the facts show that the cell houses at Pontiac functioned as prisons within a prison, and the determination of when force was necessary was made by the ranking officers in the cell house. The defendant Schomig did not authorize the use of chemical agents in the plaintiff's cell house while the plaintiff was at Pontiac, nor did he know of or condone any

---

[25]This statement, based on the affidavit of inmates, is unsupported by persons with direct knowledge and cannot successfully contradict the sworn statement of the defendant Gragert that she only facilitated paperwork on phone calls and had no involvement in the decision to grant or deny special phone calls or visits.

[26]While it is possible that gang members of ever race faced discipline according to the defendant Schomig's sworn affidavit, this statement is not relevant to the plaintiff who is not alleged to be a member of a gang.

9

use of chemical agents against inmates simply because of gang affiliation. While the plaintiff claims he filed a grievance or grievances on the issue, the defendant Schomig never reviewed those grievances. The plaintiff admits he never saw the defendant Schomig use chemical agents, and can produce no evidence to establish that the defendant Schomig, rather than the Majors and Superintendents noted on the Use of Chemical Agent Log, ordered chemical agents to be used at any time in his vicinity.

The plaintiff bases his belief that the chemical agents were being utilized to get back at the gangs on a statement he alleges was made by an officer that, "[w]e're getting back even with them gangs." Even if some correctional officer made that statement about the use of chemical agents, his statement cannot be imputed to the defendant Schomig[27], nor can any knowledge of an improper use be attributed to the defendant Schomig.

As a counselor, the defendant Gragert did not have the authority to approve or disapprove the use of force or to make decisions as to what was to be done with inmates in the vicinity of the use of chemical agents. Judith Gragert cannot be held liable for failure to take action she was not authorized to take. In the case of deliberate indifference to a serious medical need, the Seventh Circuit has held that, "[a] layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service." *Burk, supra*. Likewise, just because she was told about the plaintiff's alleged problems with chemical agent exposure, the defendant Gragert's failure to find a way to keep the plaintiff from proximity to chemical agents, when those decisions had to be made first by medical staff (in determining if he had to be removed from the vicinity) and security staff (in determining when and where the chemical agent was to be used), cannot be a basis for liability.

Neither the defendant Schomig nor the defendant Gragert had any involvement in the denial of a critical illness phone call or visit. The plaintiff argues that both the defendant Gragert and the defendant Schomig denied him visits and a phone call to his family while his father was ill in April, 2002. However, the phone call from Mr. Flournoy's sister, Gloria, requesting a phone call to the plaintiff's father was received by Tonya Davis, an Office Assistant in the Clinical Services Office at Pontiac. Because Ms. Davis sometimes assisted the counselors in verifying the truth of information received from family members or inmates, she wrote down the information received from Mr. Flournoy's sister, and called the hospital to verify the information. However, Beverly Hoskins, R.N. at the Evergreen Rehabilitation Center informed Ms. Davis that the plaintiff's father was not critical and that he was in the rehabilitation center for radiation treatment and a stroke. After Davis could not verify the information about the plaintiff's father, no further action was taken on the request. The plaintiff admits he never spoke with the defendant Schomig about his desire for a phone call with his father, and does not know what the personnel at the hospital related about his father's condition. Therefore, the plaintiff cannot dispute the fact that neither the defendant Gragert, nor the defendant Schomig ever received a request from the plaintiff or his family for a special visit or phone call. In fact, the

---

[27]See Fed.R.Evid 802(d)(2).

defendant Schomig routinely delegated those decisions to subordinates, and even if the defendant Gragert had received such a request, she did not have the authority to grant or deny it.

The undisputed material facts establish that Tonya Davis received the call from the plaintiff's family and that when she checked with the institution housing the plaintiff's father, she was told that he was not critical. While this information turned out to be incorrect, there is no evidence that anyone other than Ms. Davis knew of the request for a phone call or visit. There is no evidence that either of the defendants, Gragert or Schomig, denied the plaintiff either a phone call or a visit from his family.

Notwithstanding the lack of evidence to prove the merits of the plaintiff's case, in his response, the plaintiff has not submitted any admissible evidence to support his claim that either the defendant Schomig or the defendant Gragert had any personal involvement in the alleged constitutional violations. In response to the defendants' sworn affidavits, and documentary evidence regarding this lack of involvement, the plaintiff has merely offered his conclusion that, because of their positions, these particular defendants were personally involved. He also opines that because they were supposed to have made the decision, they are liable if the decision was made in an improper manner by some other person. Claims under this theory, that because a person held a particular position and was charged with certain duties, he is liable regardless of who performed or failed to perform the duties, are official capacity suits and are barred by the Eleventh Amendment. The plaintiff states that it is immaterial to this case whether the decisions at the heart of the matter, i.e., whether to use chemical agents, was delegated. However, it is clear that *respondeat superior* cannot be the basis for liability under §1983. *See Burks v. Raemisch,* No. O7-3041 (7 th Cir. February 10, 2009).

Finally, there is nothing in the admissible, material facts before the court that would suggest, by any stretch of the imagination, that any of the actions by Schomig or Gragert were motivated by racial animus. The court finds that neither the defendant Schomig nor the defendant Gragert had any personal involvement in the alleged violations of the plaintiff's constitutional rights, which is required in order for the plaintiff to state a cognizable claim Section 1983 claim. Therefore, the defendants' summary judgment motion is granted [228].

Based on the foregoing it is ordered:

1.  IT IS THEREFORE ORDERED that the defendants' motion for summary judgment [228] is allowed. The clerk of the court is directed to enter judgment in favor of the defendants, Schomig and Gragert, and against the plaintiff pursuant to Fed. R. Civ. P. 56. The case is terminated. The parties are to bear their own costs, except for defendants, Jordan-Luster and Funk, whose costs are assessed against the Plaintiff, Flournoy. See the Seventh Circuit Court of Appeal November 18, 2005 mandate [97].

2.  If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court within 30 days of entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on

appeal. *See* Fed. R. App. P. 24(a)(1)(c). If the Plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28U.S.C. 1915(g).

Enter this 20th day of October 2009.

**s\Harold A. Baker**
_____
Judge Harold A. Baker
United States District Judge